IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JORGE GUERRERO,                           )
                                          )
        Plaintiff,                        )
                                          )
        v.                                )    Case No. 03 C 7483
                                          )    Magistrate Judge Nan R. Nolan
JO ANNE B. BARNHART,                      )
COMMISSIONER OF SOCIAL SECURITY,          )
                                          )
        Defendant.                        )

## MEMORANDUM OPINION AND ORDER

Plaintiff Jorge Guerrero seeks review of a final decision of the Defendant Commissioner of

Social Security Administration denying his claims for the establishment of a period of disability and

disability insurance benefits under §§ 216(I) and 223 of the Social Security Act and Supplemental

Security Income benefits under §§ 1611 and 1614 of the Act, 42 U.S.C. §§ 416(I), 423, 1381(a) and

1382(a). This matter is before the Court on the parties' cross-motions for summary judgment.

Guerrero asks the Court to reverse the Commissioner's denial of his application for benefits or

alternatively, to remand his case for further determination of his disability. The Commissioner seeks

an order affirming the ALJ's decision to deny Guerrero's application for benefits. For the reasons

explained below, Guerrero's motion [18-1] is denied, and the Commissioner's motion [21-1] is

granted.

## PROCEDURAL HISTORY

Guerrero filed an application for Social Security Disability Insurance Benefits and

Supplemental Security Income benefits on March 3, 2000, alleging a disability onset date of

December 14, 1998 due to two ruptured discs in his lower spine and resulting pain. (R. 177, 190,

400). His application was denied initially on May 22, 2000 and again on reconsideration on July 13, 2000. (R. 157, 163, 403, 408). Guerrero requested an administrative hearing, which was held before Administrative Law Judge ("ALJ") John Kraybill on May 10, 2001. (R. 47-107). On October 9, 2001, a supplemental hearing was held. (R. 110-154). On October 24, 2001, the ALJ issued a decision denying Guerrero's claim. (R. 18-29). On July 25, 2003, the Appeals Council denied Guerrero's request for review, making the ALJ's decision the Commissioner's final decision. (R. 9-10).

## FACTUAL BACKGROUND

Guerrero was born on May 24, 1952. (R. 177). He earned his GED after he left military service. (R. 67). He attended community college for two years but did not graduate. Id. Guerrero worked in the past as an assembler, packager, fork lift driver, material handler, and machine operator. (R. 146, 203-07).

### A. Medical Evidence

On November 11, 1994, Guerrero saw Dr. Timothy K. McGonagle, M.D., and complained of pain and numbness in his left heel and deep aching pain in the left thigh and left lateral hip. (R. 242). Dr. McGonagle performed motor and sensory nerve conduction studies on Guerrero. (R. 241). The studies showed slightly diminished peroneal and tibial motor amplitudes and slightly prolonged responses on the left side as compared to the right. Id. Needle examination revealed very mild spontaneous and insertional abnormalities in proximal and distal S1 and some L5 innervated muscles with mild motor unit changes as well. Id. The most prominent findings were in the semimembranosis muscle on the left side, which showed questionable changes in the lumbosacral paraspinal muscles. Id. Dr. McGonagle concluded that the mild abnormal findings seemed most

-2-

consistent with mild S1 and perhaps L5 radiculopathy on the left side. Id. Dr. McGonagle stated that there were some changes which suggested that this condition may have been both chronic and perhaps superimposed acute. Id.

X-rays of Guerrero's lumbar spine performed on December 7, 1994 revealed a large disc herniation centrally and to the left at L-5, S-1, moderate disc bulging at L-4, L-5, and diffuse bulging of the annulus without encroachment on the thecal sac at L-1, L-2. (R. 243). The x-rays also revealed that Guerrero's spinal canal diameters were moderately narrowed but not stenotic. Id.

On January 13, 1995, Dr. Jack Casini saw Guerrero upon his admission to MacNeal Hospital. (R. 245). The discharge summary describes Guerrero as having a "long history of back pain radiating down his left lower extremity refractory to conservative treatment." Id. An MRI documented a ruptured disc at L5-S1 on the left. Id. On the day of admission, Dr. Casini performed a lumbar microdiskectomy at L5-S1 on the left. Id. Guerrero had a full recovery and returned to work. (R. 313, 314).

On December 18, 1998, Guerrero was seen by Diana R. Williams, M.D., in the emergency room of MacNeal Hospital. (R. 253-54). He complained of severe lower back pain, radiating to his left leg beginning two weeks prior to his arrival at MacNeal Hospital. (R. 253). Guerrero reported that the pain began when he was working. Id; (R.314). An x-ray of the lumbar spine revealed mild anterior compression deformities of T12 and L1 vertebral bodies and mild degenerative joint disease in the lower lumbar spine. (R. 250, 253). Guerrero was given Demerol in the emergency room and a prescription for fifteen Vicodin tablets with no refills. (R. 253). He was also given an excuse from work for three days. Id. Guerrero was instructed to follow-up with Dr. Casini and to return to the emergency room or contact his doctor immediately if symptoms worsen significantly. Id.

-3-

From December 21, 1998 to December 24, 1998, Guerrero was admitted as an inpatient at MacNeal Hospital. (R. 259-260). Guerrero complained of sharp pain especially in the left gluteal area and radiating down the left thigh past his knee with numbness and tingling. (R. 275, 276). He reported that he could not walk, was forced to crawl to the bathroom, and could not lay on his back. Id. The examining physician, Ron Reilly, M.D., noted that Guerrero was "in moderate distress." (R. 277). Dr. Reilly diagnosed Guerrero with intractable back pain. Id Guerrero was given Demerol, Valium and Toradol. (R. 277-80).

On December 22, 1998, a MRI of the lumbar spine showed degenerative spondylosis with mild canal stenosis at L3-4 and L4-5, a small left paramedian disc bulge L1-2 and centrally at L3-4, and a very small extrusion at L4-5. (R. 318). By December 23, 1998, Guerrero felt better, was ambulating well, had less back pain, was neurologically intact, and was released to go home. (R. 266). On December 24 ,1998, Guerrero rated his pain as a 1 out of 10 and was discharged. (R. 265). On discharge, he was given a prescription for Motrin and Flexeril. (R. 284). He was instructed not to lift and to follow up with Dr. Casini. Id

On January 14, 1999, Guerrero reported to Dr. Casini that much of the pain in his leg was resolved, but he had some numbness in his calf and "mild soreness in his back." (R. 314). On examination, his gait was normal, he could toe-and-heel walk and squat, he had full range of motion of the lumbar spine, there was no paravertebral spasm, his sciatic notches were nontender, straight leg raising was negative, and neurologically he was intact to motor, sensory, and reflex testing in both lower extremities except for some decreased sensation to soft touch in his left calf and left foot. Id. Dr. Casini stated in a letter to Guerrero's employer dated January 14, 1999: "An MRI done recently demonstrates a congenital stenosis at several levels. There are postoperative changes at L5-

-4-

S1 on the left and a bulging disc at L4-L5 on the left consistent with his symptoms." (R. 315). His diagnosis was "disc protrusion, L4-L5 superimposed on congenital stenosis." Id. Dr. Casini's letter to Guerrero's employer concluded:

> At this point, he is improving considerably. I do not believe any further treatment is indicated. However, this gentleman in the face of two disc protusions and congenital stenosis is likely to have repetitive episodes if he continues in an occupation with heavy lifting. I have therefore recommended that he not be employed in an occupation that involves repetitive lifting and bending or lifting any more than thirty pounds at one time. These restrictions should be on a permanent basis.

(R. 315); see also (R. 308).

On February 10, 1999, Paul G. Faine, M.D., saw Guerrero in the MacNeal Emergency Department. (R. 324).[1] Guerrero walked into the Emergency Department. Id. Guerrero complained of heaviness and pressure in his upper back that radiated to his left leg and which had been occurring for one week prior to arrival. Id. Dr. Faine noted that Guerrero was in no distress. Id. Examination revealed paravertebral tenderness, without spasm, normal range of motion, no point tenderness, bilateral straight leg raising negative, and normal neurological exam. Id. The diagnosis was back pain. Id. Guerrero was discharged home with instructions to apply warm compresses to his back and neck for two days and to take Ibuprofen. Id. He was also given a prescription for Flexeril. Id. Guerrero was advised to follow up with Occupational Health. Id.

On February 24, 1999, Guerrero sought treatment in the emergency room reporting severe lumbar back pain beginning approximately two days prior to arrival. (R. 320). Guerrero stated that his symptoms were aggravated by movement and the only comfortable position for him was laying

---

[1] On February 10, 1999, Guerrero first contacted Dr. Casini with complaints of a headache and neck pain. (R. 313). Guerrero stated that his "spinal cord hurts" and his "head feels heavy." Id. Guerrero explained that he had been in pain for a couple of days. Id. Dr. Casini informed Guerrero that he had no expertise in that area and referred him to another doctor. Id.

on the floor. Id. On exam, Guerrero had paravertebral tenderness and spasm and positive straight leg raising, but normal range of motion, intact sensory and motor function, normal reflexes, and a normal, but guarded gait. (R. 320). He was prescribed Motrin and Flexeril, instructed to rest in bed and apply warm compresses for two days, and to follow up with Dr. Casini in two days. There is no evidence in the record indicating that Guerrero followed up with Dr. Casini or that he sought any type of treatment for back pain for the next two years.[2]

On April 18, 2000, Dean Thomas Velis, M.D., conducted an internal medicine consultative examination of Guerrero for the Bureau of Disability Determination Services. (R. 327). Guerrero reported that he suffers from chronic and persistent pain radiating down his left lower extremity, worsened by any motion of the lumbar spine. Id. Guerrero stated that he was not even able to lift a gallon of milk. Id. He further stated that the only thing that improved his symptoms was laying down. Id. Guerrero reported taking Motrin for his symptoms. Id. On exam, Dr. Veils found paravertebral muscle tenderness without spasm, range of motion within normal limits with end range pain, and positive straight leg raising on both sides at ten degrees. (R. 328). Guerrero's gait was normal. Id. An x-ray showed "[e]arly degenerative changes involving the vertebral endplates and lower facets, otherwise negative study." (R. 331). Guerrero's uncorrected vision was 20/100 and 20/70, but his corrected vision was 20/50 and 20/30. (R. 328).

On May 15, 2000, Robert T. Patey, M.D., a non-examining physician, completed a Physical Residual Functional Capacity Assessment regarding Guerrero's condition. (R. 332-39).[3] Dr. Patey

---

[2] In April 1999, Guerrero received a prescription for eyeglasses. (R. 341).

[3] "Residual functional capacity" is how much an adult can do despite his impairment. Hickman v. Apfel, 187 F.3d 683, 689 (7th Cir. 1999).

noted Guerrero's ruptured disc as well as his degenerative spondylosis with mild canal stenosis but also noted that there was no evidence of any residual or recurrent disc herniation. (R. 339). Dr. Patey also noted that Guerrero had a full range of motion in his spine and was able to ambulate in a normal manner but due to his complaints of pain, would be limited to medium work activity. Id. Dr. Patey indicated that Guerrero could lift 50 pounds occasionally, lift 25 pounds frequently, stand and walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push and/or pull unlimited. (R. 333).

On April 23, 2001, Guerrero was seen at the orthopedic clinic of the Hines Veteran's Administration Hospital. (R. 350). Guerrero complained of low back pain, radiating into both legs and associated with his level of activity. Id. Guerrero reported that he "sometimes" took Ibuprofen and it helped but that he did not take a regular maintenance dose. Id. On exam, Guerrero had a limp but was able to walk on his heels and toes. Id. Straight leg raising was equivocal on the left at 80 degrees, and he had mild sensory deficits in L4-S1 zones on his left leg. Id. An x-ray that same day showed "degenerative change of the lumbar spine with marginal spur formation and slight narrowing of the L5-S1 disc space." (R. 354). Guerrero was diagnosed with chronic low back pain with radicular symptoms and instructed to take Ibuprofen and to keep an appointment with the physical medicine and rehabilitation department. (R. 350).

On April 26, 2001, Guerrero was examined in the Hines VA's physical medicine and rehabilitation clinic. (R. 347-49, 369-70). Guerrero stated that he had increasing lower back pain with lower extremity weakness since the 1998 injury and that to relieve the pain, he took Ibuprofen and laid down. (R. 348). He described his current pain as a 4-5 and his maximum pain as 7-8 on a scale of 0 to 10. Id. Guerrero had a limping gait. (R. 349). He was described as having low back

-7-

pain with radicular symptoms in multiple lumbar levels. Id. Guerrero was instructed to begin use of a TENS unit followed by moist heat in physical therapy three times a week for three weeks in addition to a home exercise program. Id. He was further instructed to continue Ibuprofen for pain control. Id.

On May 7, 2001, Guerrero was evaluated by physical therapy. (R. 375-76). He reported that his pain was a level 4 out of 10. (R. 375). He further reported that his pain was aggravated by walking, changing from sitting to standing, bending, lifting, sitting, lying down, driving, coughing, sneezing, and standing and that it was relieved by lying down and walking. Id. On May 14, 21, and 29, 2001, Guerrero attended physical therapy and reported that his back pain was level 4 out of 10. (R. 372, 373, 374). On May 18 and 24, 2001, Guerrero missed his physical therapy appointments. (R. 372, 373). On May 30, 2001, Guerrero was issued a TENS unit. (R. 365).

## B.     Testimony at the Administrative Hearings

Guerrero testified that he lived with his girlfriend and his three college-aged children. (R. 56). Guerrero stated that he is in pain every day and constantly from the time he wakes up until the time he goes to sleep. (R. 64-65). Guerrero explained that the pain is in his lower spinal cord and that, upon certain types of movement, it shoots up to his head and radiates down his left leg into the heel. (R. 64). When the pain is at its peak, it sometimes radiates into his right leg as well and feels like a pinched nerve. Id.

Guerrero testified that he has tried to help his girlfriend with mopping or vacuuming but after two to three hours, this caused pain and he would have to lay down. (R. 61-62). Later he testified that he could vacuum for an hour before having to lay down and take Motrin. (R. 78). Guerrero takes 400 milligrams of Ibuprofen for pain relief. (R. 62-63). He may take four to six Motrin pills

-8-

per day, depending on his anticipated level of activity. (R. 63). Guerrero stated that he could sit for two to three hours at a time and walk for 30 minutes at a time. (R. 59-60). Dr. Casini gave Guerrero a 30 pound lifting limitation, but Guerrero stated that lifting 20 pounds would be "heavy" and "hurting." (R. 60).

Guerrero testified that he had not gone to the emergency room for pain for two to three years prior to the May 10, 2001 hearing. (R. 66). Guerrero stated that until recently, he was unaware that as a veteran he is entitled to medical treatment at the VA hospital free of charge. (R. 65). He indicated that his girlfriend said that he could go to Cook (presumably referring to Cook County Hospital), but that he did not "want to go to Cook." Id. The ALJ asked Guerrero to explain the gap in his medical treatment. Guerrero replied that after Dr. Casini sent him home on Motrin, he felt that Dr. Casini did not know what Guerrero needed, so Guerrero tried to give himself physical therapy. (R. 74-75). The ALJ indicated that he did not understand Guerrero's reasoning. (R. 75). The ALJ stated "when I get hurt, I go to the doctor." Id. Guerrero replied: "[s]ome of us don't have money or transportation." Id. When asked whether anyone ever explained to him at any time that he could go the VA hospital for free, Guerrero replied "I never been the kind of person that was like going to the hospital." Id.

In November 2000, Guerrero's counsel urged him to make an appointment to see the doctors at the VA "as soon a possible." (R. 83-82). Guerrero did not go to the VA until April 2001, just a couple of weeks before his hearing. (R. 81-82, 92-93, 105-06). Guerrero explained that he had to wait until his wife or children had the time to take him or there was money available for transportation. (R. 81-82). Guerrero and his girlfriend never called the VA to find out if the VA would arrange to have him picked up and brought to the hospital and then brought back home. (R.

93). The Hines VA Hospital is located approximately five miles from Guerrero's home. (R. 133-34).

Guerrero also testified that his driver's license expired and he did not need a car because his sons and daughter have cars. (R. 78). Guerrero would like to get a driver's license but his doctor told him he would be unable to get a driver's license because his eyes are so bad. (R. 76). Guerrero's glasses are broken. (R. 79). He explained that he might get his eyes examined after he finds out what the VA can do for his spinal cord. (R. 80). Guerrero can read big print. (R. 98). He cannot read regular or fine print as it just "looks like scribbles." Id. Guerrero believes that his eyes have deteriorated in the last year. (R. 99).

Guerrero's girlfriend, Lillian Calderone, also testified at the hearing. She indicated that she works two jobs and that Guerrero cleans the house, does the dishes, picks up after the college-aged children, and generally keeps up the house. (R. 85). She explained that he cannot scrub the kitchen floor because he ends up in a lot pain. Id. He also experiences pain after vacuuming and sweeping. (R. 89-90). Calderone testified that Guerrero drives once in a while despite his lack of a driver's license. Id. Calderone has seen Guerrero in a lot of pain particularly when he tries to do a lot around the house. (R. 89-90). Calderone stated that Guerrero is "not doing good at all." (R. 86). Sometimes when they walk to the drugstore, Guerrero is in so much pain that he must walk on his "tippy toes." Id. Calderone explained that she could not take off work to take Guerrero to the VA in late 2000 when his attorney advised him to go to get evidence to support his claim of disability. (R. 92-93). She stated that she told Guerrero how to get to the VA but "he's the type that I have to hold him by the hand to get things done." (R. 93).

-10-

At the October 9, 2001 supplemental hearing, Guerrero testified that he did not return to Dr. Casini after the second injury because he did not have insurance and the doctor would not see him without it. (R. 126). Guerrero stated he recently developed ulcers from the Motrin he was taking for the back pain. (R. 112). The doctors at the VA planned to substitute shots for the Motrin. (R. 121). Guerrero testified that he had gone to four or five physical therapy sessions, each lasting for a couple of hours. (R. 119). Guerrero also explained that he was currently using a TENS unit twice a day and that it gives him "some kind of relief, not much." (R. 118). Guerrero had requested Valium to relieve nerve spasms in his back. Id.

Although his driver's license was still expired and he still had no glasses, Guerrero continued to drive. (R. 119-20). He testified that he tries not to drive, but if necessary, he will drive his daughter to school. (R. 119). Guerrero testified that about a year and a half or two years ago, he tried to work at the Salvation Army. (R. 124). He worked for about a month, but had to stop because he was in too much pain. Id. Calderone testified at the supplemental hearing that when she saw Guerrero, most of the time he was lying in bed. (R. 130). He puts an board under the mattress for support. Id. Calderone further testified that the TENS unit does help reduce Guerrero's pain but that he also still depends on Motrin for pain relief. Id. Calderone took Guerrero to the emergency room earlier in the week because he aggravated his back while sweeping and vacuuming. (R. 131).

A vocational expert (VE), Gleeann Kehr, also testified at the supplemental hearing. The VE testified that most of Guerrero's past relevant work experience was unskilled and required medium to heavy exertion. (R. 146-47). The ALJ asked the VE whether jobs existed for a 48 year old man with a GED degree and work experience as described at the hearing, with a small disk bulge, no neurological deficits, treatment for pain and the current medications do not cause significant adverse

-11-

side effects on the ability to work, limited to performing "traditional light exertional level work," meaning lifting up to 20 pounds occasionally, ten pounds frequently, the ability to stand six out of eight hours "so they sit six out of eight hours," with no repetitive bending, overhead work, or work around bouncing or vibrations, occasional climbing of stairs or ladders, no reading fine print, and limited to unskilled work. (R. 147-48). The VE testified that such a person could perform 6,000 cashier jobs, 7,500 fast food worker jobs, and 1,500 clothes room worker jobs. (R. 148). The VE also testified that the jobs he identified were consistent with the Dictionary of Occupational Titles. Id.

Guerrero's counsel propounded a second hypothetical to the VE with the following restrictions: an individual with the same background and work history as Guerrero's, maximum lifting 20 pounds on an occasional basis, lifting 10 pounds frequently, no repetitive bending, no overhead work, no reaching or extending, only occasional climbing of stairs, no climbing of ladders on a steep angle as would be associated with painters and roofers, the climbing of stairs would be limited to two flights, with rest after such activity, no reading small print, sitting no more than two to three hours, with a sit/stand option, and a requirement of lying down to rest for a period of an hour after two to three hours of sit and stand, walking limited to half an hour, with a stop and rest afterward, walking would be at a slow pace with a limp, no twisting at the waist even in a standing or sitting position, no extreme heat, cold, fumes, or high humidity, and the person takes medication that causes a stomach ache (with Motrin) and fatigue or drowsiness at least once or twice a day if four to six pills a day are taken. (R. 151). Based on this hypothetical, the VE testified that "there'd be no substantial gainful activity available." Id. The VE explained:

-12-

Primarily any time someone needs to rest after two to three hours for as much as an hour outside of, say, a normal work break, then wouldn't be able to complete a full eight-hour workday and that alone would preclude substantial gainful activity. If someone is fatigued and sleepy as much as one to two hour - or one to two times per day so that they were just not functional, that, again, would not allow them to complete a full workday. Overall . . . it would be considered a less than sedentary RFC so in ways it would preclude substantial gainful activity.

(R. 151-52).

Guerrero's counsel proposed another hypothetical with the following limitation: if the individual mopped a kitchen floor that was approximately nine by twelve and then "got sick because of it or was in general 'wiped out' for an hour or two." (R. 152). The VE confirmed that this hypothetical would be consistent with a less than sedentary classification. Id.

## C.    The ALJ's Decision

The ALJ found that Guerrero had not engaged in substantial gainful activity since his alleged onset date of disability. (R. 23). He found Guerrero's vertebrogenic disorder severe but not severe enough to meet or equal a listed impairment. Id. The ALJ further found that Guerrero can perform the exertional demands of light work, except that he could not read smaller than medium-sized print, could not do repetitive bending, overhead work, or work around bouncing or vibration, and could only climb stairs and ladders occasionally. (R. 26). The ALJ found that Guerrero was limited to the performance of unskilled work. Id. The ALJ further found that Guerrero could not perform any of his past relevant work. Id. The ALJ consulted the Medical-Vocational Guidelines as a "framework" and relied on the testimony of the VE in determining that Guerrero retains the residual functional capacity to perform a significant number of jobs and is not disabled. (R. 26-27).

## DISCUSSION

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled within the meaning of the Act, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently gainfully employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, see 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is able to perform her former occupation; and (5) whether the claimant is able to perform any other available work in light of her age, education, and work experience. 20 C.F.R. § 404.1520(a) (2004); Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." Clifford, 227 F.3d at 868 (quoting Zalewski v. Heckler, 760 F.3d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. Stevenson v. Chater, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of

credibility. Estok v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998).

The ALJ denied Guerrero's claim at Step 5, finding that Guerrero retains the residual functional capacity to perform a significant number of jobs in the national economy. Guerrero argues that the ALJ's decision should be reversed because: (1) the ALJ's credibility determination was erroneous and did not follow SSR 96-7p; 2) the ALJ erroneously relied on the VE's testimony; and 3) the ALJ improperly calculated Guerrero's age category. The Court addresses each argument in turn.

## A. Credibility Determination

The ALJ found Guerrero's allegation of disabling pain not credible. Guerrero contends that the ALJ's credibility determination was erroneous because he failed to follow Social Security Ruling 96-7p. Social Security Ruling 96-7p states that ALJs must provide "specific reasons" for a credibility finding. ALJs must also evaluate the credibility of the claimant's testimony about his symptoms in light of seven factors: (1) daily activities, (2) the location, duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) the type, dosage, effectiveness, and side effects of medication, (5) treatment, (6) other measures used to relieve the pain, and (7) other factors concerning functional limitations. SSR 96-7p. An ALJ's credibility determination is entitled to "special deference" and will be reversed only if it is "patently wrong." Scheck v. Barnhart, 357 F.3d 697, 703 (7th Cir. 2004); Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000).

The ALJ provided sufficient support for his finding that Guerrero was not credible regarding his allegation of total disability. The ALJ noted that Guerrero's description of the severity of his pain was inconsistent with the medical findings in the record. (R. 25). None of the medical experts concluded that Guerrero has disabling limitations. In fact, there is no doctor's opinion contained in

the record which indicated greater limitations than those found by the ALJ, and Guerrero's treating surgeon thought his condition required no further treatment. (R. 26, 315). The ALJ considered the longitudinal medical record and observed that Guerrero had "gone for long periods of time without medical treatment for his back pain." Id. The ALJ specifically noted that Guerrero had no medical treatment for approximately two years until he consulted physicians at Hines VA in the spring of 2001. (R. 24). The ALJ further considered Guerrero's explanation of lack of money and insurance for his failure to follow through with recommended treatment and therapy. (R. 25). The ALJ rejected Guerrero's explanation for failing to seek medical treatment for pain because Guerrero is a veteran entitled to receive medical treatment from the Veteran's Administration. Id. The ALJ noted that Guerrero used only Motrin, Ibuprofen, Tylenol, Excedrin, or aspirin to manage his pain. Id. The ALJ observed that Guerrero had cancelled or failed to show up for physical therapy appointments on a number of occasions. Id.

Guerrero argues that the ALJ improperly rejected his explanations for his infrequent medical treatment. Under SSR 96-7p, the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Inability to afford treatment and inability to access free or low-cost medical services "may provide insight into the individual's credibility." SSR 96-7p.

As required by SSR 96-7p, the ALJ considered Guerrero's explanation for his lack of treatment. The ALJ stated: "Guerrero has alleged a lack of money and insurance as the reason for his failure to follow through with recommended treatment or therapy." (R. 25). The ALJ rejected

-16-

Guerrero's explanation:

> The claimant is a former Marine who was involved in combat in Vietnam, and who is eligible for medical treatment and is now receiving medial care through the Veterans Administration Hospital. Since this same treatment was also available to him for the two year period during which he had no medical care, a lack of money or insurance is not a valid excuse, and persuades the undersigned that the claimant's symptoms were not as severe or debilitating as he alleges during that period.

Id.

Guerrero points out that he gave explanations for his gap in medical treatment. Guerrero testified that he was unaware that he could seek treatment at the VA Hospital free of charge and that Dr. Casini, his treating physician, would not see him because he lacked medical insurance. (R. 65, 126). The ALJ was free to reject Guerrero's explanation for his infrequent medical treatment. Social Security Ruling 96-7p requires the ALJ to consider whether the inability to afford treatment or lack of access to free or low-cost medical services may be a good reason for failing to pursue treatment, but it does not require the ALJ to accept Guerrero's testimony about his infrequent medical treatment. SSR 96-7p specifically states, "[i]n making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements. Based on a consideration of all of the evidence in the case record, the adjudicator may find all, only some, or none of an individual's allegations to be credible."

Other evidence in the record indicated that Guerrero did not seek treatment from February 1999 to April 2001 because he did not want or need treatment. Guerrero testified that his girlfriend suggested that he could seek treatment at Cook County Hospital but Guerrero did not "want to go to Cook." (R. 65). Guerrero also testified that he did not need to go to the emergency room because of back pain during that two year period:

-17-

Q       Have you had to go to the emergency room at all because of the pain?

A       Not since the last time.

Q       And when was the last time then?

A       About two, three years ago.

(R. 66).

Guerrero's argument that he promptly pursued treatment at the VA Hospital once he learned that he could obtain free treatment is not supported by the record. Guerrero's attorney urged him to go to the VA in late 2000 to get evidence to support his disability claim, but Guerrero did not go until April 2001, only a couple of weeks before his hearing. (R. 81-82, 92-93, 105-06). Guerrero's contention that his lack of transportation (e.g., vision impairment, cannot afford eyeglasses, expired driver's license, and no vehicle) hindered his ability to seek regular treatment for two years is also undermined by other evidence in the record. Guerrero and his girlfriend testified that he occasionally drives and has taken a cab or a bus home from the VA which is only about 5 miles from his home. (R. 87, 132, 199). For example, Guerrero testified that he tries "not to [drive] but if I have to take my daughter to college, I will do it." (R. 119). It was the ALJ's responsibility to resolve conflicting evidence in the record. Donahue v. Barnhart, 279 F.3d 441, 444 (7th Cir. 2002) (stating "the resolution of competing arguments based on the record is for the ALJ, not the court."). Substantial evidence supports the ALJ's rejection of Guerrero's explanation for his infrequent medical treatment.

Guerrero appears to contend that the ALJ failed to consider his daily activities and Guerrero's statements regarding his pain and limitations, including his statement that his symptoms were aggravated by the performance of housework, such as mopping and vacuuming. Pl's Memo. 19-20. The ALJ considered Guerrero's testimony regarding his daily activities and his allegations of pain

-18-

and limitations. In his decision, the ALJ noted: "The claimant testified that he spends a great deal of time in bed, and that mopping the floor of his apartment puts him in bed for the next four to five days." (R. 25). The ALJ also considered the testimony of Guerrero's girlfriend. Id. Although the ALJ could have discussed Guerrero's and his girlfriend's testimony regarding his daily activities more thoroughly, his listed reasons–severity of Guerrero's alleged pain not consistent with the medical record, long periods of time without medical treatment for his back pain, and failure to take the type of medications one would expect for disabling pain–allow this court to adequately review his conclusions and provide substantial evidence for his credibility determination. An ALJ must at least build "an accurate and logical bridge from the evidence to [his] conclusion," and ALJ Kraybill did so here. Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001).

Guerrero next argues that the ALJ failed to cite evidence in the record which support his rejection of Guerrero's reported limitations. However, the ALJ specifically cited medical evidence inconsistent with Guerrero's allegations which allowed the ALJ to discount Guerrero's claim. For instance, the ALJ pointed out that the Physical Residual Functional Capacity Assessment completed by Robert T. Patey, M.D., a state agency physician, supported a finding that Guerrero was not disabled. Dr. Patey determined that Guerrero could perform the exertional demands of medium work. (R. 339). Dr. Patey found that Guerrero had even greater abilities than those found by the ALJ. The ALJ noted that Dr. Patey was a non-examining physician and that generally, more weight is given to examining physicians over non-examining ones. (R. 25). Although Dr. Patey did not examine Guerrero, he reviewed all evidence in the record as of the date of his opinion. (R. 332). The ALJ properly relied on Dr. Patey's opinion. Flener v. Barnhart, 361 F.3d 442, 447-48 (7th Cir. 2000) (stating "it is appropriate for an ALJ to rely on the opinions of [state agency] physicians and

psychologists who are also experts in social security disability evaluation.").

Guerrero states that there in no conflicting evidence from any of his treating physicians regarding his limitations, and Dr. Casini recommended permanent lifting and bending restrictions. As an initial matter, Guerrero's claim that there is no evidence from any of his treating physicians which conflicts with his reported limitations is not entirely accurate. On April 18, 2000, Guerrero reported to Dr. Velis that he could not lift a gallon of milk, which weighs less than 9 pounds. (R. 327). At the May 10, 2001 hearing, Guerrero testified that he could comfortably lift and carry 20 pounds but it would be "heavy" and "hurting." (R. 60). Dr. Casini found that Guerrero should not lift anymore than thirty pounds at one time. (R. 315). Thus, Guerrero's statements regarding his lifting abilities are somewhat inconsistent with Dr. Casini's finding regarding his maximum lifting ability.

The ALJ found Guerrero has the residual functional capacity to perform the exertional demands of light work, which includes lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. (R. 26). The ALJ noted that additional evidence submitted since Dr. Casini's opinion was formed required a further narrowing of Guerrero's residual functional capacity. (R. 26). The ALJ's finding is not contrary to the finding of Dr. Casini. The ALJ was justified in accepting the lifting and bending limitations of Dr. Casini and then further narrowing Guerrero's residual functional capacity based on additional evidence submitted since Dr. Casini formed his opinion. Most importantly, the ALJ accurately observed that no treating or examining physician concluded that Guerrero has disabling limitations or has limitations greater than those found by the ALJ. (R. 26).

Guerrero further argues that the ALJ erred in relying on the state agency physician's opinion because the physician's credentials were not included in the record and the physician did not examine Guerrero. Guerrero has not cited any authority imposing a requirement that state agency physician's qualifications and backgrounds be included in the administrative record. Although Dr. Patey's credentials are not included in the record, the Commissioner's Memorandum correctly points out that the AMA web site's DoctorFinder indicates that Robert Thayer Patey, M.D., of Springfield, Illinois is board certified in Internal Medicine and graduated from Harvard Medical School. Guerrero has not explained how he was prejudiced by the failure to include Dr. Patey's credentials in the record and how a remand to include Dr. Patey's credentials in the record would lead to a different result. The court thus concludes that the failure to include Dr. Patey's credentials in the record does not constitute reversible error.

The fact that Dr. Patey was a nonexamining physician is not also dispositive. Reviewing state agency physicians never examine disability claimants. Rather, their job is to "consider the evidence in your case record and make findings of fact about the medical issues, including, but not limited to . . . your residual functional capacity." 20 C.F.R. § 404.1527(f)(1). ALJs must consider the findings of state agency physicians like Dr. Patey. ALJs are required to consider state agency physicians' findings as expert opinion evidence. 20 C.F.R. § 404.1527(f)(2)(i) (describing consulting physicians as "highly qualified physicians . . . who are experts in Social Security disability evaluation.").

Moreover, the medical evidence in the record dated after Dr. Patey's assessment supports a finding that Guerrero is not disabled. On April 23, 2001, the orthopedic clinic at Hines VA diagnosed Guerrero with chronic low back pain with radicular symptoms and instructed him to take

-21-

Ibuprofen for pain relief. Three days later, Guerrero was examined in the Hines VA physical medicine and rehabilitation clinic and described his current pain as 4-5 on a scale of 0 to 10. Guerrero was instructed to begin use of a TENS unit followed by moist heat in physical therapy in addition to a home exercise program and to continue Ibuprofen for pain control. On four occasions in May of 2001, Guerrero described his current pain as a 4 on a scale of 0 to 10 during physical therapy sessions. The VA's conservative treatment measures and Guerrero's descriptions of his level of pain support Dr. Patey's assessment. None of the VA records which post-date Dr. Patey's assessment indicate greater limitations than he found or that Guerrero suffers from disabling pain.[4]

Guerrero argues that "[o]nce it is determined that an impairment exists, the opinions of treating physicians are entitled to substantially greater weight than the impressions of a doctor who sees the claimant only once." Pl's Memo. at 22. This is not a case where a treating physician's opinion was disregarded in favor of the opinion of a consulting physician or a one-time examining physician. In this case, none of Guerrero's treating or examining physicians opined that he was disabled or that he had any limitations greater than those found by the ALJ.

Contrary to Guerrero's assertions, the ALJ did not "play doctor" by making an independent medical determination in finding that Guerrero has not received the type of medical treatment one would expect for a totally disabled person. The regulations direct the ALJ to evaluate Guerrero's treatment and to look for objective evidence that corroborates his subjective statements of pain. 20 C.F.R. §404.1529; see also SSR 96-7p. The ALJ accurately described Guerrero's longitudinal

---

[4] Guerrero also complains that Dr. Patey's opinion "did not meet the SSR 96-2p criteria regarding weight to State agency physicians." Pl's Memo. at 22. SSR 96-2p concerns evaluating medical opinions concerning when treating source medical opinions are entitled to controlling weight, not non-examining physicians' opinions. Because Guerrero does not explain specifically how Dr. Patey's opinion fails to meet the criteria of 96-2p, his argument is unavailing.

medical record. The ALJ properly based his credibility finding on the lack of medical treatment during the period between March 1999 and April 2001.

Guerrero faults the ALJ for neglecting to address Guerrero's use of over-the-counter painkillers and argues the ALJ erred in finding that he did not take narcotic medications. Guerrero's arguments are without merit. The ALJ did not fail to address Guerrero's use of over-the-counter medication and did not find that Guerrero did not take narcotic medications. The ALJ found:

> [T]he claimant has not taken the variety, dosage, or types of narcotic pain medications that one would expect, considering the type of debilitating pain that the claimant alleges . . . Except at the immediate time of his injury, he has taken nothing stronger than Motrin, Ibuprofen, Tylenol, Excedrin, or aspirin. The claimant's use of medications does not suggest the presence of an impairment which is more limiting than found in this decision.

(R.25). The ALJ accurately summarized Guerrero's history of medication use. When Guerrero first made complaints of back pain in the emergency room, he was given short-term doses of narcotics, but he was not given these medications on a long-term basis. Moreover, Guerrero stated on April 23, 2001 when being seen at the VA orthopedic clinic that he "sometimes" took Ibuprofen but had no regular maintenance dose. (R. 350). Guerrero also reported on a March 12, 2000 Pain Questionnaire that he gets "some" pain relief from his over-the-counter medications even though he still has an "uncomfortable feeling." See Donahue, 279 F.3d at 444 (evidence that claimant "relied for pain control on over-the-counter analgesics" supports conclusion that pain is not disabling.); Powers, 207 F.3d at 435-36 (reliance on drugs not intended to treat severe pain suggests claimant may be exaggerating condition).

Guerrero argues that the ALJ erred in failing to evaluate the side effects of the over-the-counter medication as required by SSR 96-7p. On March12, 2000, Guerrero reported that his over-

-23-

the-counter medications made him "go to sleep." (R. 211). There is contradictory evidence in the record. On March 3, 2000, Guerrero stated that he had no side effects from Motrin, Aleve, or Tylenol. (R. 195). SSR 96-7p provides that in evaluating the credibility of a claimant's subject complaints, the ALJ must consider, among other factors, the side effects of any medication the individual takes or has taken to alleviate pain or other symptoms. Although Guerrero assets that the ALJ failed to consider the side effects of his over-the-counter medications, the record demonstrates otherwise. The ALJ explicitly noted in his decision that he considered all of Guerrero's symptoms, including pain, in light of the requirements of SSR 96-7p. (R. 24). The ALJ noted in his decision that Guerrero claims that "he spends a great deal of time in bed . . . ." (R. 25). The ALJ found, however, that Guerrero's allegations with respect to his limitations, including his claim that he spends a significant amount of time in bed, not totally credible. The Court finds no error in the ALJ's SSR 96-7p analysis.[5]

Guerrero also argues that the ALJ's decision is not supported by substantial evidence because the ALJ did not seek an updated opinion from Dr. Casini. On January 14, 1999, Dr. Casini, Guerrero's treating surgeon, opined that Guerrero should not be employed in an occupation that involves repetitive lifting or bending or lifting any more than thirty pounds at one time. (R. 315). The ALJ found, among other things, that Guerrero was limited to lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds and no jobs involving repetitive bending. (R. 28). Guerrero argues that even though Dr. Casini's opinion was limited to Guerrero's ability to perform lifting or bending, it was inappropriate for the ALJ to infer that Dr.

---

[5] The ALJ also considered Guerrero's claim that he is developing ulcers as a result of his use of over-the-counter pain medication. (R. 23). The ALJ noted that this allegation was not supported by the medical record. Id.

Casini did not believe Guerrero had stand/walk limitations. Guerrero contends that "[i]n order to have the most up-to-date information with which to render a decision, the ALJ should have recontacted Dr. Casini, specifically to determine if Dr. Casini would impose any stand/walk limitations." Pl's Memo. at 24.

The ALJ did not err in failing to contact Dr. Casini for an updated medical opinion. The ALJ had a duty to fully and fairly develop the record, and he fulfilled that obligation. Smith v. Apfel, 231 F.3d 433, 437 (7th Cir. 2000). The Seventh Circuit has held that district judges "must respect the authority of administrative officials to decide how much is enough" because "one may always obtain another medical examination, seek the views of one more consultant, wait six months to see whether the claimant's condition changes, and so on." Kendrick v. Shalala, 998 F.3d 455, 456-57 and 458 (7th Cir. 1993). On January 14, 1999, Dr. Casini wrote a one and a half page single-spaced letter to Guerrero's former employer and concluded with a recommendation of no lifting over 30 pounds and no repetitive lifting and bending on a permanent basis (R. 314-15). Dr. Casini's opinion was based on his examination of Guerrero, x-rays taken of Guerrero's lumbar spine, and a recent MRI. Id. It was reasonable for the ALJ to find that because Dr. Casini included no other restrictions, including stand or walk limitations, he believed no other work-related restrictions existed.

Moreover, the ALJ properly relied on Dr. Casini's opinion even though it was two years old at the time of the ALJ's decision. In Luna v. Shalala, 22 F.3d 687, 693 (7th Cir. 1994), the Seventh Circuit rejected the contention that the ALJ is required to "update objective medical evidence to the time of [the] hearing." Although the Commissioner has the burden of proving Guerrero's capacity to perform a limited range of light work, it is Guerrero's duty "to bring to the ALJ's attention everything that shows that he is disabled." Id. "This means that [Guerrero] must furnish medical

and other evidence that the ALJ can use to reach conclusions about his medical impairment and its effect on his ability to work on a sustained basis." Id.

Guerrero's alleges disability since December 1998, and Dr. Casini's opinion in January 1999 is relevant to the issue of Guerrero's ability to work. Because there was no medical evidence to support Guerrero's counsel's proposed stand/walk limitations (sit/stand option, and a requirement of lying down to rest for a period of an hour after two to three hours of sit and stand, walking limited to half an hour, with a stop and rest afterward, walking would be at a slow pace with a limp), the Court defers to the ALJ's conclusion that contacting Dr. Casini was not necessary. Guerrero's claim that given the two-year span between Dr. Casini's opinion and the ALJ's decision, "it is likely that Dr. Casini would have considered Plaintiff's longitudinal history and imposed stricter limitations on Plaintiff's ability to work and perform daily activities" is speculation. Binion v. Shalala, 13 F.3d 243, 246 (7th Cir. 1994) (stating "[m]ere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand."). Also, there was substantial medical evidence in the record to support the ALJ's finding that Guerrero can perform a good deal of walking or standing as required by light work. (R. 333). Guerrero presented no medical evidence specifically supporting his claimed standing and walking limitations. The ALJ's failure to obtain an updated opinion from Dr. Casini regarding Guerrero's ability to walk and stand is not reversible error.[6]

_____

[6] Guerrero cites SSR 96-6p in support of his assertion that the ALJ was required to contact Dr. Casini for an updated opinion. Pl's Memo. at 24. SSR 96-6p states in pertinent part that an ALJ is required to obtain an updated medical opinion from a medical expert in the following circumstance: "When additional medical evidence is received that in the opinion of the administrative law judge . . . may change the State agency medical . . . consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." Guerrero's argument is unpersuasive. He fails to explain what "additional medical evidence" would

Finally, Guerrero contends that the ALJ erred in rejecting the additional limitations proposed by Guerrero's counsel to the VE (i.e. a sitting requirement of no more than two to three hours, with a sit/stand option limitation and a requirement of laying down to rest for a period of an hour after two to three hours of sitting and standing; walking limited to a half an hour, with a stop and rest afterward, and the half hour would be at a slow pace with a limp; no twisting at the waist, turning left or right, even in a standing or sitting position secondary to pain; extreme heat, cold, or fumes, as well as high humidity to be avoided because of pain associated with these elements; and person takes medication (Motrin) that has a side effect of a stomach ache and fatigue or drowsiness occurring at least once or twice a day). The ALJ's residual functional capacity finding incorporated all limitations supported by medical evidence in the record and substantial evidence supports this finding. The ALJ did not error in rejecting the additional limitations proposed by Guerrero's counsel.

## B.     Vocational Expert's Testimony

In response to the ALJ's hypothetical, the VE testified that Guerrero could perform 6,000 cashier jobs, 7,500 fast food worker jobs, and 1,500 clothes room worker jobs. (R. 148). Guerrero argues that the vocational expert's testimony does not provide substantial evidence for the ALJ's finding that he is capable of performing a significant number of jobs in the national economy because the Dictionary of Occupational Titles' (DOT) definition of the fast-food worker job exceeds Guerrero's residual functional capacity as found by the ALJ. Guerrero also complains that the

---

have changed the State agency medical consultant's finding that Guerrero's impairments do not meet or equal criteria of any listed impairment. Guerrero has not explained how any specific evidence received after the state medical consultant's opinions should have caused the ALJ to doubt the reliability of their findings and to call for an updated medical opinion from Dr. Casini.

"clothes room worker" job is not listed in the DOT and the closest job definitions of "Cloth Folder" and "Clothing Maker" exceed his abilities.

It does not matter whether the VE's testimony was in conflict with the DOT with respect to the fast food worker jobs or the clothes room worker jobs. Even assuming that Guerrero is unable to perform the fast food worker and clothes room worker jobs, the VE testified that there would still be a significant number of cashier jobs that Guerrero could perform.[7] Six thousand cashier jobs is a significant number of jobs. Lee v. Sullivan, 988 F.2d 789, 794 (7th Cir. 1993) (holding 1,400 jobs is a significant number). The VE's testimony constitutes sufficient evidence for the ALJ's finding that Guerrero is capable of performing a significant number of jobs in the national economy.

## C.     Borderline Age Analysis

One last issue remains. Guerrero argues that the ALJ erred by classifying Guerrero as a "younger individual" and by failing to place him in a higher age category as may be appropriate in borderline age situations. Guerrero was born on May 24, 1952 and was 49 years old at the time of the ALJ's decision. At the time of the ALJ's decision, Guerrero was 7 months short of his 50th birthday. A person age 18 to 49 is classified in the "younger person" age category. 20 C.F.R. § 404.1563(a). A person age 50 to 54 is classified in the category of "closely approaching advanced age." 20 C.F.R. § 404.1563(d). The ALJ noted that Guerrero was 49 years old and was therefore considered a younger individual. The ALJ did not consider whether a borderline age situation existed.

---

[7] Guerrero did not challenge the VE's testimony regarding 6,000 cashier jobs until his reply brief. The Court rejects Guerrero's challenge to the cashier jobs. It is too late to make an argument for the first time in a reply brief because the Commissioner is denied an opportunity to respond. Baloun v. Williams, 2002 WL 31426647 at *9 (N.D. Ill. Oct. 25, 200) (Nolan, M.J.).

The ALJ's application of Rule 202.20 as a framework and reliance on the VE's testimony in making his findings is supported by substantial evidence. Whether Guerrero's situation of seven months shy of his 50th birthday qualifies as a borderline situation is not expressly decided by the regulations. "The regulations refer to a claimant being 'within a few days to a few months' of the older age category, but the cases tend to treat claimants who are within six months of 50 years old as presenting borderline cases." Smith v. Barnhart, 2002 WL 126107 at *3 (N.D. Ill. Jan. 31, 2002)(citing cases); see also 20 C.F.R. § 404.1563(b) (emphasis added) and Pickard v. Commissioner of Social Security, 224 F.Supp.2d 1161, 1167 (W.D. Tenn. 2002) (noting that courts have generally "conclud[ed] that the borderline range falls somewhere around six months from the older age category."). The court need not determine whether a seven month gap should require a borderline age analysis by the ALJ because the decision to place Guerrero in the younger person age category was not determinative here. The regulation requires consideration of the older age category in a borderline situation where "using the older age category would result in a determination or decision that you are disabled." 20 C.F.R.§ 404.1563(b). The ALJ determined, based on Rule 202.20, that Guerrero, being a younger person, a high school graduate, who previously performed unskilled work, and having the residual functional capacity to perform light work is not disabled. Rule 202.13 similarly directs a finding of not disabled for a person closely approaching advanced age, a high school graduate, who previously performed unskilled work, and having the residual functional capacity to perform light work. If the ALJ had thus applied the next age category (Rule 202.13), Guerrero would still have been found disabled. Guerrero recognizes as much when he states in his reply brief that "at the sedentary level, Plaintiff would have been considered disabled." Pl's Reply at 7. Because the ALJ's determination that Guerrero retained the residual functional

capacity to perform a limited range of light work is supported by substantial evidence, the ALJ did not err in classifying Guerrero as a younger individual and failing to perform a borderline age analysis.

## CONCLUSION

For these reasons, the ALJ's decision denying Guerrero's application for benefits is affirmed. Guerrero's motion for summary judgment [18-1] is denied, and the Commissioner's motion for summary judgment [21-1] is granted. The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff pursuant to Federal Rule of Civil Procedure 58.

**E N T E R:**

Nan R. Nolan

**Nan R. Nolan**
**United States Magistrate Judge**

**Dated: October 3, 2005**